## LEAKE v. NEW YORK CENT. R. R.

District Court, N. D. New York.
June 12, 1939.

James Gibson, of Albany, N. Y. (Clarence B. Des Jardines, of Washington, D. C., and R. Gray Williams and J. Sloan Kuykendall, both of Winchester, Va., of counsel), for plaintiff.

Whalen, McNamee, Creble & Nichols, of Albany, N. Y. (Melvin H. Coulston, of Washington, D. C., and Kenneth O. Mott-Smith, of New York City, of counsel), for defendant.

COOPER, District Judge.

This is a patent infringement suit. Plaintiff sues upon patent to Arthur G. Leake, No. 1,770,932. Application filed May 17, 1929, Patent granted July 22, 1930. Plaintiff relies upon claims 1, 6, 12, 14. The patent is for a method of strengthening structural members under load.

The alleged infringement is the use of this method by the defendant in the repairing of bridge 0229 at Oswego, generally known as the Oswego Tunnel Bridge, and also in the repairs to Signal Bridge No. 759-A (Smith Street) Buffalo, N. Y.

The defenses are:

1. That plaintiff was not the discoverer and first inventor of the process of the patent in suit, but that such process was invented by Thomas McHugh and disclosed by defendants' engineer, Harry T. Welty, to the plaintiff.

2. That the patent is void for lack of invention in view of the prior art and is anticipated in the prior art.

3. That plaintiff is guilty of laches and is estopped from asserting infringement against the defendant.

The patent states that it relates to particular members of a structure under load. It does not relate to strengthening the structure as a whole or considered as a unit.

The patent declares that it relates to strengthening members of such a structure, such as "beams, girders and the like while they are under load and has for its object to provide a method of strengthening such members which will not require the removal of concrete or other structure supported by the member to be strengthened,— and will not require the holding up of overhead traffic and will reduce interference with other traffic to a minimum."

The patent refers also to plate and angle girders, rolled steel sections, angle and channel bars.

There is particular mention of strengthening girders in a structure supporting a roadway over railroad tracks and reference is made to the strengthening being performed without tearing up the concrete construction or interfering with traffic over the structure. Stress is also laid upon saving of time and lessening of cost of repairs.

It was stipulated by the parties on Sept. 29, 1938, that while plaintiff claims that each of the claims of the patent in suit has been infringed by the defendant, plaintiff will, at the trial, rely upon claims 1, 6, 12, and 14 only. This stipulation was made several months before the trial.

Upon the trial the defendant asked the Court to find that each of the remaining claims of the patent are invalid upon the same grounds set forth in the defenses above stated.

The plaintiff seems to have at least partially acquiesced in this request by the defendant.

But it seems to this Court that to decide upon the validity of 14 claims not relied upon by the plaintiff in his charge of infringement against the defendant is to decide academic questions.

It is not necessary, to determine the questions here involved, to decide more than the validity and infringement of the four claims relied upon by plaintiff in this suit.

To decide upon the validity but not the infringement of the other 14 claims, for infringement is not charged, is to put an undue burden upon the Court. Furthermore, while such decision would be binding upon the parties in suit, it would not and should not be binding upon other parties in later infringement suits brought for the infringement of one or more of the other 14 claims where such other parties might have other defenses, but such decision might, nevertheless, prejudice such other alleged infringers of the other 14 claims.

Therefore, the decision will be confined to the validity and infringement of the four claims relied upon by the plaintiff in this suit.

These four claims are as follows:

"1. A method of strengthening a structural member while it is under load which comprises welding a strengthening member at one end to the structural member, changing the temperature of the strengthening member to a temperature different from the member to be strengthened, welding the other end of the strengthening member to the structural member while the temperature of the strengthening member is so changed, permitting the temperature of the two members to become substantially the same, and then welding the two members together at points between the two end welds."

"6. A method of strengthening a structural member while it is under load which

comprises welding a strengthening member to the structural member at its opposite ends, at least one of said ends being so welded while the strengthening member is at a different temperature than the structural member so that when the members return to the same temperature the strengthening member will have an initial stress, and welding the two members together at points between the end welds."

"12. A method of strengthening a structural member while it is under load, which comprises welding a strengthening member to the structural member at one side of the portion to be strengthened, heating the strengthening member to increase its length and welding the strengthening member to the structural member at the other end of the portion to be strengthened while the strengthening member is so heated."

"14. A method of strengthening a structural member while it is under load, which comprises welding a strengthening member to the structural member at opposite sides of the portion to be strengthened, at least one of said welds being welded while the strengthening member is at a different temperature than the structural member so that when the members return to the same temperature, the strengthening member will have an initial stress."

As the Court understands, it is conceded that one or more of the four claims have been infringed by the method of pre-stressing the steel plates during attachment to the girders to be strengthened in the two bridge structures, viz. 0229 at Oswego and 759-A at Buffalo, if the plaintiff is the original inventor of the pre-stressing method of the patent and the patent is valid.

It is helpful to an understanding of the issues here, especially as to who was the originator of the patented method, if the relations of the parties are stated as disclosed by the evidence. The time of this relation is the last two months of the year 1928 and January, 1929.

In 1928 the defendant determined that the supporting girders of one of the bridges over its tracks, as such tracks ran through the Bronx on their way to the Grand Central Station, needed repairs. The bridge was at Brook avenue in the Bronx, over which bridge passed the traffic of Brook avenue. This bridge was known as M-4-A.

The plaintiff at the time was the president of the Leake & Nelson Company of Bridgeport, Conn., engaged in welding and other work in construction and repairs to bridges.

At some time in October, 1928, the plaintiff, as the president of the Leake & Nelson Company, was informed by a representative of the Westinghouse Electric Company that the defendant was contemplating repairs to one of its bridges and the repairs would involve welding; that he, Leake, had better look into this matter; and that request would be made by the Westinghouse Electric representative that Leake's firm be asked to bid on the repairs to the bridge.

The plaintiff claims that directly after the receipt of that letter and before invitations to bid were sent out he inspected the bridge, though it does not clearly appear that he had been informed which bridge was to be repaired, and saw the condition of the girders supporting the structure of the bridge.

The plaintiff asserts that he began to think about the matter and that on October 21st, while partially disabled from an injury to his leg, the method of the patent in suit, in whole or in part, came to him in thought and that shortly thereafter in November and early in December he began a series of experiments to determine the practicability of the idea or thought which had occurred to him, namely, to weld steel plates expanded by heat to steel beams, so that he could determine the effect upon the beam by cooling of the plate.

He claims to have had in mind supporting the bridge structure at Brook Avenue, welding one end to the girder, expanding and elongating the same by heat and then attaching the free end, while heated, to the girder by welding, allowing the steel plate to cool and thereby set up a stress in the steel plate, which would be communicated to and become a strengthening of the girder.

In his experiments during the cooling, he made intermediate welds between the two ends of the steel plate so attached to the beam at various points of contact between the steel plate and the beam.

By December 15, 1928 be put his ideas in an affidavit form for protection.

This method of elongating the steel plate by heat after welding one end and then welding the other end after it had reached the desired elongation is called in this case the pre-stressing method.

About November 25, 1928, the defendant's company received an invitation to bid on the repairs to this bridge on certain plans and specifications received in evidence here. These plans and specifications called for the placing of the steel plate on the bottom of the steel girder and of about the same length. There is no suggestion that the steel girder was to be heated or expanded in any way whatever. It was, however, to be welded at both ends of the girder.

On December 8, 1928, the Leake & Nelson Company submitted a bid which was apparently the lowest bid.

On December 11th, 1928, the Smith-Hamburg-Scott Welding Company by McHugh also submitted a bid for the same work.

Shortly after the receipt of the Leake & Nelson bid, there was a discussion between the plaintiff and Mr. Welty, the defendant's bridge engineer in charge of the work, and it appeared that the method of placing and attaching the cold plates to the bottom of the girders was not definitely settled or was not satisfactory to the defendant's engineer.

Shoring up of the girders during attachment of plates was considered by defendant's engineer, it being understood that one of the two railroad tracks must be kept free for the passage of trains.

The Leake & Nelson Company were asked to submit a bid for the shoring and did so in a letter of December 17, 1928, received by defendant December 18, 1928.

The shoring also seemed unsatisfactory to the defendant, and on the same day of its receipt, viz, Dec. 18, 1928, Welty retained the Leake & Nelson bid for shoring and asked for a bid on the so called drift pin method. This was returned at a conversation in New York between the two men. On December 18, 1928, Leake wrote Mr. Henderson, associated with plaintiff's firm, as follows:

"This morning Mr. Welty returned to me my bid of December 17th, which after deducting the $8604.00 (cost of shoring) still leaves us low bidder at approximately $19,000.

"As I told you before, the shoring in the tunnel isn't practicable but they wanted a bid on it and now he has requested that I give him a bid on his idea of strengthening the plates with pins.

"I was about tempted at the time to submit my idea of heating the plate but thought I would wait until I returned to him tomorrow the plan on which Bill Nelson is working, showing the drift pins."

On December 18 or 19, 1928, plaintiff wrote Mr. F. B. Freeman of the defendant company, submitting bid on the drift pin method of attaching the plates to the girders. With the bid was a sketch. It shows the drift pin method but contains a note saying: "Heat Cover Plate To a Temperature as Instructed by N. Y. C. R. R. Company Engineers." This bid and sketch were received by the defendant on December 20th, 1928.

Plaintiff claims to have had a conversation on the same day or the next day with Welty in which he disclosed to Welty the heating or pre-stressing method of attaching the plate to the girder and Welty asked plaintiff to have his concern submit a bid on the pre-stressing method of attaching the plates to the girders. Welty also told the plaintiff he would have to get a checking bid.

Sometime between December 20th and December 26th, 1928, Welty wrote plaintiff an undated letter asking plaintiff his opinion of method of applying heat and asking for a bid if plaintiff thought the same practicable. Defendant lays much stress on this letter which will be more fully referred to later herein.

On December 26th, 1928, Leake submitted his bid on pre-stressing by heat in a letter to Mr. Freeman. The price was slightly lower than the prices on other methods. On the same 26th, plaintiff wrote Mr. Welty a letter telling of the submission of the bid. McHugh on January 4th, 1929, sent a bid on the same pre-stressing method of attaching plates to girder. The price was higher than the Leake & Nelson bid. Leake Company's bid was accepted January 12, 1929, and the contract made January 14, 1929.

The plaintiff performed the contract, which was satisfactory to the defendant Company, and received its contract price.

During the construction the plaintiff was called by defendant's engineers to apply the same method to another and considerably smaller bridge near the East River and this was done.

Plaintiff applied for a patent on the method in May, 1929, and was awarded the patent on July 22, 1930.

Plaintiff claims to be the originator of the method for which the patent was later awarded to him.

The defendant contends that the plaintiff was in no wise the originator of the patent and that the method was disclosed to him by Mr. Welty, the defendant's engineer.

Defendant's contention is that when the defendant's engineer asked McHugh, of the Smith, Hamburg & Scott Welding Company, to submit a bid on the drift pin method, the Welding Company's representative, Mr. McHugh, told Mr. Welty that he did not care to bid on that method and urged the adoption of the method by which the steel plate would be attached to the under part of the girder at one end and welded and then by heating, expanded or elongated to the prescribed distance and then welded at the free end and allowed to cool—that intermediate welds be applied either while in process of cooling or after cooling.

Defendant further contends that Mr. Welty asked Mr. McHugh to submit a bid on that method and said he must get another bid and that he thereupon communicated to the plaintiff McHugh's idea and asked him also to submit a bid upon this pre-stressing or elongating of the steel plate attached to the girder; that plaintiff company did submit a bid as also did Mr. McHugh, that the plaintiff's bid was accepted. Mr. McHugh's bid was received about January 4th, 1929.

The bid of the Leake & Nelson Company was received on December 26th, 1938, as before stated.

It is upon this oral testimony of McHugh and Welty, together with the undated letter of Welty to Leake and Leake's letter of December 26th, that defendant rests its contention that McHugh and not Leake was the discoverer and originator of the pre-stressing method of the patent in suit.

After the defendant had submitted the evidence of Mr. McHugh and Mr. Welty, the plaintiff offered evidence in rebuttal.

This testimony consisted partly of the testimony of witnesses who aided the plaintiff in the various experiments which he claims to have performed, dated office memoranda addressed to its various witnesses, asking them to appear at certain times and places for these experiments and assistance therein. Plaintiff also offered a document purporting to be sworn to by plaintiff himself on December 15, 1928, which date it bears, before a notary public employed in the office and witnessed by two female employees then in the office and testified to by the stenographer who wrote the document.

The plaintiff's contention of originality of invention is supported by not less than seven or eight witnesses, some of whom are still in the employ of the Leake & Nelson Company with which the plaintiff severed his connection some years ago and several of which have not been employed with that Company for years, together with this within shop memoranda and the affidavit of December 15th.

There can be no reasonable doubt that the experiments related to a method of attaching a steel plate or cover to a steel girder or bar by the pre-stressing method described in the patent.

The affidavit dated December 15, 1928, also describes the method of the patent but perhaps in somewhat less technical language than the patent but nevertheless clearly indicating the method.

There is further evidence inconsistent with the claim that McHugh was the inventor of the process.

In July, 1929, plaintiff advised defendants' bridge engineer Welty that he had applied for a patent on this pre-stressing method of strengthening members of bridge structures and sent him a copy of the application for patent.

In October, 1929, the Engineering News Record contained an article by Mr. Welty entitled "Unusual Methods used in Repair of Roof Girders in Street Underpass," and referred to the repair of Brook Avenue Bridge M-4-A.

In the article he described the method used as a "Novel method of heating cover plates with torches Immediately Prior to their Attachment by arc welding." The article also contained this significant statement: "The Leake and Nelson Company, of Bridgeport, Conn. was contractor for the work and has applied for patents covering the above described method of re-inforcing structural members, including the equipment used."

■■ A patent carries with it a presumption of its validity. To establish either a prior public use or prior invention by some other person, the evidence must be so clear and convincing as to practically establish

beyond a reasonable doubt invention by some person other than the patentee.

Except for two certain letters passing between Mr. Welty and the plaintiff, the defendant's evidence that Mr. McHugh was the originator of the method consists entirely of the oral testimony of Mr. McHugh and Mr. Welty, given more than ten years after the conversation took place.

The undated letter from Welty to Leake sent sometime between December 20th and 26th, 1928, is as follows:

"Referring further to the proposed repairs to our bridge M-4-a, New York City, involving considerable welding:

"On thinking this matter over further, I fear that some difficulty would be encountered in drilling holes in the new cover plates with sufficient accuracy to obtain the results desired.

"Would it be practicable to weld one end of the cover plate, than apply heat sufficiently to expand the plate to the amount desired and keep the plate in this condition long enough to weld the other end? By doing this, drift-pinning would be unnecessary and the expenses of drilling holes would be saved.

"If this method of doing the work would be practicable please advise your price on this basis, other features remaining the same as before."

Leake's letter of December 26th to Mr. Freeman accompanying the bid on the pre-stressing method said: "We submit herewith revision of our quotations of December 8th and December 19th, all in accordance with conversation with Mr. Welty, Engineer of construction, and his letter."

The drift pin specifications were submitted to Leake's firm December 18th. Presumably they were submitted to McHugh's firm about the same time.

On December 20th, Leake sent the drawing with the legend "heat etc."

Welty claims that the talk with McHugh was before the date of December 26th and before the undated letter which must have been sent between December 20th and 26th.

Why, if McHugh was the originator of the heat expansion or pre-stress method, did Leake's bid come in on December 26th and McHugh's bid not come in until January 4th.

The facts are consistent with Leake disclosing the method to Welty on or after December 26th, asking McHugh for the check bid he told Leake he was intending to obtain, which check bid was received January 4th, 1929.

They are not consistent with McHugh disclosing the new method and submitting a bid and Welty getting a check bid from Leake's firm.

It may be admitted that Welty's letter without date reads as if it was Welty's idea conveyed to Leake, but Welty was the writer and chose the language and perhaps did not want to acknowledge that some one else originated the idea.

Leake's letter of December 26th to defendant's Mr. Freeman speaks of "conversation with Mr. Welty and his letter."

Moreover, Welty knew that Leake was applying for a patent on the pre-stressing process and wrote the article in the Engineering News in which he stated that Leake had applied for a patent.

Manifestly, Welty never protested that McHugh and not Leake was the discoverer of the pre-stressing method of the patent.

Presumably McHugh and his firm saw Welty's article. McHugh never protested. Nor did he or any member of his firm use the pre-stressing method on any work.

None of McHugh's partners with whom he claims to have discussed the pre-stressing method were sworn as corroborating witnesses on the trial.

■ The weight of evidence is with the plaintiff as to the origin of the discovery. Certainly the defendant has not met the burden of establishing beyond reasonable doubt that McHugh was the first discoverer of the pre-stressing method.

In any event, even if the testimony of conversations of more than ten years ago be accepted as showing that McHugh first disclosed the pre-stressing method to Welty, the fact remains that plaintiff conceived the idea of that method and conducted several experiments to ascertain its practicability and usefulness some weeks before the time defendant claims McHugh disclosed the method to Welty.

Plaintiff's evidence rests not alone on oral testimony but on documentary evidence, including the affidavit of December 15, 1928, which has not been effectively attacked, and cannot well be discarded.

Moreover, the Leake Company's bid on the drift pin, apparently received by the defendant before the claimed disclosure by McHugh to Welty, contained the sketch

and legend referring to the heating or prestressing method.

The defendant cannot succeed on this point and the decision is that the plaintiff was the originator of the pre-stressing method of the patent.

Next comes the question (2) whether or not the patent is invalid in view of the prior art.

It is quite true that no prior art was cited by the patent office in the consideration of the application for the patent in suit and the presumption of validity may be weakened if any prior art is here shown pertinent to process of the patent in suit.

The prior art cited here consists of two U. S. patents and four publications.

U. S. Patent No. 1,391,659, granted to Rapp and Vanario June 14, 1921, relates to giving more tension or strength to a frame or structure particularly adapted for airplanes.

This patent does not relate to strengthening a member of a structure under load nor is there any welding of a strengthening member to a structural member.

Patent No. 1,451,655 to Schenstrom, granted April 10th, 1923, relates only to welding to secure structural members together in the construction of a truss and does not contemplate or remotely suggest strengthening of structural members under load.

The prior art upon which defendant chiefly relies is the article entitled: "Reconstructing Poughkeepsie Cantilever Bridge for Heavy Traffic." contained in the Engineering News Record of March 11, 1920, pages 528 to 534. The defendant claims that this discloses the method of the patent in suit. But this is not supported by the article itself.

Various parts of the trusses or sections of this bridge were strengthened but in all but one instance this was done by riveting cold plates to the parts to be strengthened. Only upon the bottom chord was any heat or expansion by heat used.

Apparently an additional eyebar was added on each side of the four existing eyebars in parallel relation with attachments to the structure at the same place as the connection of the four eyebars. The added parts comprised a pair of upper and lower angles connected by lattice bars and riveted at one end to a gusset having a central opening adapted to fit over one of the horizontally disposed pins running through the four eyebars.

A similar gusset, not connected to the angles in question, was on the pin at the other end of the four eyebars and it was received between the free ends of the upper and lower pairs of angles as the new parts were shifted into position to place the gusset of the riveted and over its pin and the connection was lightly bolted up.

Small fires were then built under the new parts and the old parts and when the new angles had been lengthened to the desired amount, the fires were reduced to hold the expansion and tack rivets driven to hold the connection. It is claimed that the two new eyebars were also connected together by plates passing above and below the eyebars.

The article summarizes the results as "a complete riveted tension system built around the bottom chord."

Defendant's witness Freitag admitted on cross-examination that the pre-existing four eyebars were not strengthened by the addition of this riveted tension system to the structure.

It must be said that while this publication teaches that when new structural members are to be added, which are in tension when added, these new structural members should be connected in proper place after stretching by heat or otherwise, it does not teach that such expansion of a member added relates to the direct strengthening of existing members by securing strengthening plates expanded by heat directly thereto.

The Poughkeepsie Bridge article cannot be said to be an anticipation or disclosure in the prior art of the method of the process in suit.

Ganot's Elementary Treatise on Physics relating to the contraction of red hot tires on wooden wagon wheels has no real significance for it utterly lacks the idea of strengthening a member of a structure under load. The same may be said of its explanation of a method for straightening walls of a building in Paris.

The article in Railway Age, June 18, 1927, pages 1944 to 1945, relating to strengthening of the bridge over the Missouri River at Leavenworth, Kansas, relates only to strengthening of structural members by welding cold plates thereto.

There is nothing therein suggesting the pre-stressing by heat of the added plate.

The Engineering News-Record of March 1, 1929, page 330, likewise has no relation to the pre-stressing method of the patent in suit. This relates chiefly to shoring up beams while adding cover plates.

Nor can the defense successfully assail the validity of the patent in suit on the ground that it was not invention but only the exercise of mechanical skill by one skilled in the art.

This is another invention, which, looking backward, suggests that any one skilled should have seen the idea; but no one did see it of all the men familiar with the prior art and engaged in work where the method would be most valuable as established by its extensive use since the patent.

Neither Mr. Welty nor any other of defendant's efficient engineers nor those of any other railroad or bridge company with their knowledge of the prior art ever realized the possibilities of the pre-stressing method of strengthening structural members under load, as shown in the Leake Patent.

On the question of infringement at the Oswego Bridge, defendant claims that the specifications did not call specifically for cooling to normal temperature. Cooling almost necessarily implies cooling to normal temperature, but plaintiff is willing to eliminate claim one relating thereto from the charge of infringement at the Oswego Bridge.

Likewise on the Smith Street Bridge at Buffalo plaintiff is willing to concede that it has not proven infringement of claims 1 and 6. But it has by concession proved infringement of claims 12 and 14.

The decision is that claims 1, 6, 12 and 14 of the patent are valid and that claims 6, 12 and 14 are infringed in the Oswego Bridge work and claims 12 and 14 in the Buffalo Bridge Work.

■ Defendant claims that plaintiff is estopped from asserting any claims of infringement against the defendant because of plaintiff's promise not to enforce his patent against defendant.

Plaintiff denies that any such promise was made. There is no document or writing to support defendant's contention. The alleged agreement was made approximately 10 years ago. Men's interest may impair their recollection of conversations of long ago. In any event there was no consideration for any such agreement and the same is void.

■ But a more serious question arises with reference to the infringement in the Oswego Bridge repair work. It is conceded that if the patent is valid there is infringement in this bridge repair. The plaintiff was invited to bid on this job and did so. He must have known and did know that the plans and specifications prescribed the method of the patent in suit. He knew, therefore, that the defendant was infringing his patent.

He did not protest but on the contrary submitted a bid, being silent on infringement. He knew that another firm received the bid. He knew that the work would go on to completion. He at all times remained silent until after the work was fully completed and then for the first time claimed infringement.

Can it be doubted that he lulled the defendant into security as to any claim of infringement by such conduct? He should not in equity and good conscience recover from the defendant for such infringement. Dwight & Lloyd Sintering Company v. Greenwalt, 2 Cir., 27 F.2d 823; Johnston v. Standard Mining Company, 148 U.S. 360, 13 S.Ct. 585, 37 L.Ed. 480. But he did not bid on the Smith Street Bridge in Buffalo where the contract apparently was let in 1937.

Here he may recover against the defendant.

Decree may be submitted in accordance herewith with provision for a special master, unless the parties can agree upon the amount of recovery for the Smith Street, Buffalo, infringement.